## STATE OF CONNECTICUT *v.* WILLIAM TAFT
## (SC 16305)

McDonald, C. J., and Borden, Katz, Palmer and Sullivan, Js.[1]

---

[21] See footnote 17 of this opinion.

[1] Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued participation on this panel is authorized by General Statutes § 51-198 (c).

Argued December 7, 2000—officially released October 16, 2001

The listing of justices reflects their seniority status on this court as of the date of oral argument.

*Richard E. Condon, Jr.*, special deputy assistant public defender, for the appellant (defendant).

*Robert M. Spector*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Elpedio N. Vitale*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, C. J. The defendant, William Taft, appeals, following our grant of certification, from the judgment of the Appellate Court affirming the trial court's judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (5)[2] and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[3] We granted the defendant's petition for certification to appeal limited to the following question: "Did the Appellate Court properly conclude that the trial court properly denied the defendant's motion for a mistrial?" *State* v. *Taft*, 253 Conn. 909, 753 A.2d 942 (2000). The defendant claims that there are two grounds upon which his motion for a mistrial should have been granted: that it was improper for the trial court to admit evidence (1) of the defendant's failure, after his arrest, to contact his cousin; and (2) of the defendant's disclosure that he did not contact his cousin on the advice of his counsel. We reject the defendant's claims and affirm the judgment of the Appellate Court.

---

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[3] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon one's person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same . . . ."

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found. "On October 19, 1994, Ernest Herold drove to the Dunbar Cafe in New Haven with two friends. Herold parked his car behind the bar and proceeded to the front of the bar, where he began talking with the owner of the bar, Robert Williams. Herold then observed a tan Lincoln being parked in front of the bar. Three men exited the vehicle, walked to the bar entrance and began talking with Williams. The three men were Andre Provite, who is the defendant's cousin, Phil Young and the defendant.

"The three men entered the bar and Herold followed shortly thereafter. Herold ordered a beer and watched the defendant, Williams and another man playing poker. After the card game, Herold heard the defendant ask Williams for money, which Williams refused. Herold then approached the bar, and the defendant turned toward him and asked Williams whether Herold was his nephew or bodyguard or had some other relation to him. Herold then left the bar. He walked to a nearby after-hours club, entered it briefly and decided to leave. Herold then headed toward his car to go home.

"As he approached the Dunbar Cafe, Herold saw the defendant, Provite, Young and two other men standing together near the entrance to the bar. As Herold passed by the group, he heard the defendant say to one of the men: 'What the fuck is this? Who the fuck is this guy?' Herold responded: 'Why you keep asking who I am? Who are you to keep asking who I am? What is your problem?' The defendant then told Herold, 'I will show you,' and pulled out a chrome-colored pistol, which he pointed at Herold. Herold then turned to run, heard a gunshot and fell to the ground with a head wound. The bullet penetrated the back of his head, shattered his jaw and exited near his left cheek. Herold was then

rushed to a hospital."[4] *State* v. *Taft*, 57 Conn. App. 19, 20–21, 746 A.2d 813 (2000).

"The defendant fled the scene with Provite and Young and, subsequently, fled the state. He was apprehended in July, 1995, in Kansas City, Missouri, and was brought back to Connecticut to face criminal charges pertaining to these events." Id., 21.

At the trial, Provite testified for the defense that, although he had been at the Dunbar Cafe, he was in his car at the time of the shooting and did not witness it. Provite testified that moments after he heard a shot being fired, he saw the defendant, who was not carrying a gun, approach Provite's car.

Provite's testimony was impeached by a tape-recorded statement that Provite had given to the police the day after the shooting. In that statement, Provite said that the defendant had shot Herold and that he had seen Herold fall to the ground, with the defendant standing over him holding a gun. Provite also stated that he had driven the defendant from the scene because he was afraid that, if he did not, the defendant would shoot him.

The defendant later testified in his own defense that an unidentified person had purchased drugs from Herold and then stood behind Herold and shot him in the head. He also testified that he left the scene with Provite because he had been so disturbed by the shooting.

On cross-examination, the state's attorney attempted to discredit the defendant's testimony by asking the defendant why he did not contact Provite, his cousin, subsequent to his arrest. Both the defendant and Provite had testified that they had not spoken with each other after the defendant's arrest. The defendant offered the following response: "No. Why I'm going to call them

---

[4] Herold survived his wounds.

and tell them something for something I didn't do." In response to a later question about why he did not contact his cousin, the defendant replied: "I wouldn't call them and tell or put no words in his mouth." The defendant later testified, "First of all, I am not going to involve people in something I know I haven't done."

On redirect examination, the defendant testified that he had been instructed by his trial attorney not to talk to Provite or anyone "about the case." The following exchange took place between the defendant and his attorney. Question: "Didn't I tell you I didn't want you talking to [Provite] about this case?" Answer: "Yes." Question: "And I didn't want you to talk to anybody about the case, right?" Answer: "Right." The state's attorney later elicited testimony from the defendant that Connecticut defense counsel did not represent the defendant, and did not so instruct him, until approximately two months after his arrest. See id., 23. The defendant had been arrested in Missouri in July, 1995, and his trial attorney did not enter her appearance until September 27, 1995, at the defendant's arraignment in Connecticut.

Following this testimony, the defendant moved for a mistrial, claiming that the state's questions concerning his postarrest silence were improper. He also moved to strike the testimony. The trial court denied both motions. The trial court reasoned that the state's attorney's line of questioning was proper because it was relevant to the credibility of the defendant and Provite and had nothing to do with the defendant's constitutional right to remain silent. Id., 23–24. The trial court thereafter twice instructed the jury that "whenever anyone does not communicate with someone on the advice of counsel, it is not a negative factor at all," and that, if the jury found that the defendant did not contact Provite on the advice of counsel, the jury should "draw

no unfavorable inference" from that circumstance. This appeal followed.

The standard for review of an action upon a motion for a mistrial is well established. "While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . *State* v. *Wooten*, [227 Conn. 677, 693–94, 631 A.2d 271 (1993)]. On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. *State* v. *Rodriguez*, 210 Conn. 315, 333, 554 A.2d 1080 (1989); *State* v. *Bausman*, 162 Conn. 308, 312, 294 A.2d 312 (1972). The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice." (Internal quotation marks omitted.) *State* v. *Day*, 233 Conn. 813, 836–37, 661 A.2d 539 (1995). "The decision whether to grant a mistrial is within the sound discretion of the trial court." *State* v. *Correa*, 241 Conn. 322, 351, 696 A.2d 944 (1997); *State* v. *Day*, supra, 835; see Practice Book § 42-43.[5]

The defendant claims that the admission of the evidence violated his right to silence as enunciated in *State* v. *Ferrone*, 97 Conn. 258, 116 A. 336 (1922). We disagree. In *Ferrone*, this court held that "when the accused is

[5] Practice Book § 42-43 provides in relevant part: "Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case. . . ."

in custody, our law accords him the right to reply to question or statement, or to remain silent. [The accused's] silence under such circumstances cannot be laid in evidence against him." Id., 266. In *Ferrone*, the state had offered the defendant's silence in the face of accusatory police questions as an adoptive admission.

*Ferrone* concerns the doctrine of adoptive admissions under principles of the law of evidence. *State* v. *Leecan*, 198 Conn. 517, 526, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986). As we said in *Leecan*,"[w]hen a statement, accusatory in nature, made in the presence and hearing of an accused, is not denied or explained by him, it may be received into evidence as an admission on his part." (Internal quotation marks omitted.) Id., 522. We went on in *Leecan* to hold that "[b]ecause many persons . . . are aware of their right to remain silent and are frequently advised by counsel to exercise that right when arrested, the custodial setting is simply not an occasion when the circumstances naturally call upon a defendant to speak or to reply to police inquiries. Accordingly, there is ordinarily no reasonable basis to infer that a defendant's silence in such a situation indicates that he acknowledges the truth of some assertion implicit in a question asked by a police officer." Id., 526.

Other cases the defendant relies upon also concern the doctrine of adoptive admissions by silence. In *State* v. *Morrill*, 197 Conn. 507, 534–36, 498 A.2d 76 (1985), the defendant was in police custody when he was interviewed by a state police officer. The defendant was silent in response to the officer's questions as to whether the defendant had murdered the victim, and we held that the state improperly had attempted to introduce evidence of the defendant's silence as an adoptive admission. Id., 530–31. In *State* v. *Zeko*, 177 Conn. 545, 547–48, 418 A.2d 917 (1979), cited by the defendant as well, we held that a police officer improp-

erly had testified as to the defendant's silence after being advised of his rights and accused of the crime.

The defendant also relies on *State* v. *Bates*, 140 Conn. 326, 328, 99 A.2d 133 (1953), in which we held in that it was improper for the state to use silence in the face of an accusation by a complaining witness as an adoptive admission by silence. In *Bates*, we based our decision on our conclusion that the defendant's silence was not an adoptive admission because, under the circumstances, the accusation did not naturally call for a reply by the defendant. Id., 331.

In the present case, although the defendant was in custody, he was not silent in the face of accusatory police interrogation. The defendant's failure to contact Provite had nothing to do with any custodial interrogation by a police officer or the defendant's silence in the face of accusations. The testimony did not permit the jury to use the defendant's right to silence as an adoptive admission in contravention of *Ferrone* in any manner.

The defendant also cites *State* v. *Cook*, 174 Conn. 73, 76, 381 A.2d 563 (1977). In *Cook*, the defendant made a claim under *Doyle* v. *Ohio*, 426 U.S. 610, 617–18, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), which held that postarrest silence is not admissible in the wake of a defendant's having been given *Miranda*[6] warnings. In *Cook*, we held that the state improperly had cross-examined the defendant about his failure to tell the police of his alibi when he was arrested. We did so because, even in the absence of *Miranda* warnings, "many arrested persons know, without benefit of warnings, that silence is usually golden." (Internal quotation marks omitted.) *State* v. *Cook*, supra, 77. We subsequently modified *Cook* in view of *Fletcher* v. *Weir*, 455 U.S. 603, 607, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982), to apply *Doyle* only where the defendant had "received

[6] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

*Miranda* warnings." *State* v. *Leecan,* supra, 198 Conn. 526. *Cook* does not apply in the present case because the defendant makes no claim under *Doyle.*

Furthermore, after denying the defendant's motions for a mistrial and to strike the testimony, the trial court gave an instruction to the jury that this evidence was to be used only to assess the credibility of the defendant and Provite. The trial judge repeated that instruction at the conclusion of the trial, and we may presume that the jury followed this instruction. See *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.,* 255 Conn. 20, 37, 761 A.2d 1268 (2000); *State* v. *Gray,* 221 Conn. 713, 730, 607 A.2d 391, cert. denied, 506 U.S. 872, 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992); *State* v. *Rouleau,* 204 Conn. 240, 254, 528 A.2d 343 (1987).

We also reject the defendant's claim that disclosure of the fact that he did not contact Provite on the advice of his counsel was grounds for a mistrial. First, we note that the defendant's attorney made a decision to elicit from the defendant on redirect examination the fact that she had instructed him not to talk "about the case" with anyone. The law is clear that "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege." (Internal quotation marks omitted.) *State* v. *Turner,* 252 Conn. 714, 733, 751 A.2d 372 (2000). This disclosure therefore did not violate the attorney-client privilege.

Second, we note that the defendant's attorney's instructions did not fully explain the defendant's conduct. The jury still could assess the defendant's credibility on the basis of his two explanations for his conduct: his initial unwillingness to involve his cousin, and, later, his attorney's instructions. Only after the attorney's instructions were given could the defendant's conduct be based on those instructions. The jury still reasonably could have considered the defendant's earlier conduct regarding Provite as impeachment evidence.

The attorney's advice that the defendant should not talk about the case with anyone, including Provite, was broader than advice to remain silent about the defendant's own involvement in the shooting. Advice, if taken that way, that a defendant should not seek out and approach favorable eyewitnesses of whom he is aware, does not impact the defendant's right to remain silent to avoid self-incrimination. This case does not involve an attempt to turn a defendant's silence into self-incriminating testimony against the defendant such as an adoptive admission of an accusation. This case, rather, concerns the defendant's failure to contact a known eyewitness, his cousin, to ask the cousin to help him. That conduct by the defendant could be considered as evidence of the fact that he knew that his cousin would not exonerate him. See 2 J. Wigmore, Evidence (4th Ed. 1979) § 278. Such conduct is admissible as a discrediting circumstance, as would be flight or similar conduct. Id., § 267.

It is well recognized that the rule against self-incrimination applies to testimonial or communicative acts and not to conduct that is noncommunicative in nature. See *Schmerber* v. *California*, 384 U.S. 757, 761, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). The testimony concerned the defendant's nonassertive or nontestimonial act of failure to contact Provite. There was no suggestion that this conduct was self-incriminatory and testimonial in nature, the basis of the constitutional rule respecting a defendant's right to silence. We do not equate this to the defendant's becoming a witness and giving testimony against himself.

The defendant also relies on *State* v. *Bryant*, 202 Conn. 676, 523 A.2d 451 (1987), to support his claim that the motion for mistrial should have been granted. We do not agree. *Bryant* established a four part foundational requirement for the introduction of the silence of an alibi witness to impeach that alibi witness. Id.,

705. *Bryant* concerned alibi witnesses' failure, earlier on, to contact law enforcement officers. Id., 703. We are not persuaded that *Bryant* applies to the circumstances of this case.

The defendant argued at trial that the state's attorney did not have a good faith basis to pursue the questions and failed to lay a necessary foundation that the defendant could have telephoned Provite from jail. The state responded that Provite had testified that he received no telephone call or letter from the defendant after the defendant's arrest. The state also pointed out that the defendant had testified that he knew that his arrest was for the shooting to which Provite was an eyewitness. A proper foundation was established to question the defendant as to his conduct in not contacting Provite by any means after his arrest on assault charges.

The defendant also argues that *State* v. *Turner*, supra, 252 Conn. 737–38, demands that the *Bryant* standards be applied to a defendant's testimony. *Turner* does not stand for that principle. In *Turner*, this court concluded that there was a proper foundation to cross-examine the defendant about his late disclosure of alibi.[7] Id. Nowhere in *Turner* did this court hold that *Bryant* must be applied to the defendant's testimony.

The defendant relies on *State* v. *Correa*, supra, 241 Conn. 351, citing *Bryant*, for the proposition that the state was required to establish a foundation outside the presence of the jury in this case before questioning the defendant about his failure to contact Provite. *Correa*,

[7] Practice Book § 40-21 provides: "Upon written demand filed by the prosecuting authority stating the time, date, and place at which the alleged offense was committed, the defendant shall file within twenty days, or at such other time as the judicial authority may direct, a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi."

however, dealt with the question asked by the state's attorney of the defendant's brother about the brother's hatred of drugs. Id., 349. The state's attorney asked this improper question in an attempt to discredit the defendant's explanation to police as to the origin of cocaine found in the apartment shared by the defendant and his brother. Id. When the defendant objected to this question, the state's attorney argued, in the presence of the jury, that, if the defendant's explanation to the police that he had obtained the cocaine without killing the victims was truthful, the defendant would have provided that same explanation to his brother, whom the defendant knew hated illegal drugs. Id. We stated that that line of questioning should have been pursued outside the presence of the jury or at a bench conference in keeping with the state's attorney's obligation to conduct himself according to the high standards of that office. Id., 351.

We are not persuaded that a hearing outside the jury's presence was required in this case. In the absence of a prejudicial question such as in *Correa*, or an adoptive admission; see id., 351 n.20; such a requirement would unnecessarily impede a trial. There was, moreover, a sufficient foundation to question the defendant concerning Provite.

Furthermore, the trial court twice charged the jury to the effect that the defendant's failure to contact Provite, if based upon his attorney's advice, was to have no "negative" effect. We have held that such an instruction may cure the absence of a bench conference. See *State v. Correa*, supra, 241 Conn. 351–52.

For these reasons, we conclude that the trial court properly denied the defendant's motion for a mistrial and that the Appellate Court properly affirmed that ruling.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.